**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WISCONSIN**

In the Matters of

**BULK PETROLEUM CORPORATION,**                **Case No. 09-21782-SVK-11**
**et al.,**[1]                                                        **Jointly Administered**

                            **Debtors.**

## DEBTORS' DISCLOSURE STATEMENT

Bulk Petroleum Corporation and its related Debtors, as debtors in possession in this case,

(the "Debtors") submit this Disclosure Statement pursuant to Section 1125 of Chapter 11 of Title

11 of the United States Code.

## INTRODUCTION

On February 18, 2009, the Debtors filed their voluntary petitions for relief under Chapter

11 of Title 11 of the United States Code.   The Debtors have, pursuant to Section 1125 of Title

11, obtained approval of this disclosure statement.   The Bankruptcy Court has set a hearing on

the confirmation of the Debtors' Plan of Reorganization (the "Plan") for **January __, 2010 at**

**__:__ _.m.**   A copy of the notice of the hearing on confirmation of the Plan is being served on

---

[1]   The Debtorss are Bulk Petroleum Corporation, Bulk Petroleum Indiana Properties, LLC,   Bulk Petroleum Kentucky Properties, LLC, Charanjeet Illinois Stations No. 6, Inc., Charanjeet's Wisconsin Properties One, LLC, Darshan's Wisconsin Stations Eight, LLC, Gurpal Wisconsin Stations, LLC, Interstate Petroleum Products, Inc., Rakhra Wisconsin E-Z Go Stations Three, Inc., Sartaj's Illinois Nine, LLC, Darshan's Michigan Stations One, Inc., Dhaliwal's Michigan Bulk Stations Two, Inc., Rakhra Michigan E-Z Go Stations Three, Inc., Darshan's Illinois Properties Four, Inc., Dhaliwal Illinois Properties Five, Inc., Jaspal's Illinois Seven, LLC, Sukhi's Illinois Eight, LLC, Darshan's Indiana Stations One, Inc., Dhaliwal's Indiana Bulk Stations Two, Inc., Rakhra Indiana E-Z Go Stations Three, Inc., Darshan's Kansas Stations One, Inc., Darshan's Missouri Stations One, Inc., Darshan's Iowa Stations One, Inc., Dhaliwal Iowa   Bulk Stations Two, Inc., Rakhra Iowa E-Z Go Stations Three, Inc., Darshan's Iowa Properties Four, LLC, Dhaliwal Iowa Properties Five, LLC, Darshan's Wisconsin Properties Four, Inc.

Jerome R. Kerkman
Kerkman & Dunn
757 North Broadway, Suite 300
Milwaukee, WI 53202-3612
Phone:  414. 277.8200
Fax:  414. 277.0100
Email: jkerkman@kerkmandunn.com

you with a copy of this disclosure statement.

At the hearing on this Disclosure Statement, the Bankruptcy Court determined that it contains adequate information to enable hypothetical, reasonable investors typical of the holders of claims in these cases to make informed judgments whether to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT HAS BEEN DETERMINED BY THE COURT TO CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE CODE. THIS DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL OF THE PLAN BY THE COURT.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES, AND IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, **THE TERMS OF THE PLAN CONTROL.** THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON THE DEBTOR.

Case 09-21782-svk    Doc 724    Filed 11/06/09    Page 2 of 29

**CERTAIN STATEMENTS, BY THEIR NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.**

Defined terms used which are not defined in this Disclosure Statement have the meaning given them in the Plan.

Accompanying this Disclosure Statement are copies of the following, notice and service of which is hereby provided:

1.     The Plan;

2.     Order of the Bankruptcy Court approving this Disclosure Statement; and

3.     The Ballot for Accepting or Rejecting the Plan (the "Ballot") if you are entitled to vote on the Plan.

**BRIEF HISTORY OF THE DEBTOR AND EVENTS LEADING TO FILINGS**

William Grewe founded Bulk Petroleum Corporation in 1964, incorporating it as a Delaware corporation. He formed Bulk to develop the EZ-GO Brand of fuel stations in Illinois and Indiana. The business succeeded, and he sold Bulk to Gulf Oil in 1968. At the time, Bulk had its headquarters in the Chicago area and supplied and operated the EZ-GO gas stations. Bulk prospered and opened 16 stations in Michigan in the 1970's. In the early 1980's, Chevron purchased Gulf Oil/76 Corporation and Bulk continued to operate the stations as an unbranded subsidiary of Chevron.

In 1972 Darshan Dhaliwal came from India to study engineering at Marquette University. In order to support himself through school, he worked full time at a local gas station. He became

3

interested in the gas station business and leased a station at 35th and Garfield in Milwaukee. He

sold fuel and changed oil. He then leased several other local stations, building his business up to

40 locations by 1986.

In 1986, with the help of Roy Evenson, the existing president of Bulk, Dhaliwal purchased

Bulk from Chevron. Bulk then purchased the 40 stations Dhaliwal owned and continued to

operate the EZ-Go stations. Bulk moved its headquarters from the Chicago and built an office

and warehouse in Mequon, Wisconsin, that is houses the business offices of Bulk today. Bulk

structured its business so that the real estate was generally held by separate companies, all of

which, including Bulk, were solely owned by Dhaliwal. (For convenience, all the companies are

collectively referred to as "Bulk.")

Bulk proceeded to grow for the next 20 years. It acquired 12 stations in Wisconsin from

Interstate Petroleum in 1989, 15 gas station from Total Petroleum in Iowa, Kansas, Missouri and

Wisconsin in 1993, 12 gas stations from Emro Marketing, a subsidiary of Speedway, in Wisconsin

in 1995, 40 gas stations from Midway Oil in Iowa and Illinois in 2000, 10 gas stations in

Manitowoc and Two Rivers, Wisconsin from Lakeshore Oil in 2003, and 8 stations in Wisconsin

from Speedway in 2004. Bulk leased the stations to operators and supplied the supplied fuel to

them. In addition to acquiring stations, Bulk also sold stations and profited significantly from the

sales. Prior to 2009 it had never sold a station for less than its appraised value. By 2003/2004,

Bulk had built its business to 200 to 300 stations. In order to handle the administrative tasks,

Bulk setup a back office in Patiala, India to provide data entry and customer service for Bulk in

2003.

Bulk continued to grow. In November 2004 it purchased 104 Stations from Kiel

4

Brothers and supplied another 40 dealer locations located in Kentucky and Indiana.   In May 2005 Bulk purchased 6 stations in Wisconsin from Speedway.   By 2006 Bulk operated and supplied fuel to approximately 350 to 400 locations in Wisconsin, Iowa, Illinois, Indiana, Kansas, Kentucky, Michigan, Missouri and Tennessee.

In March 2007 CITGO decided not to stop supplying fuel to the Iowa and Illinois markets.   This caused Bulk to de-brand all its CITGO stations in those states.   In November 2007 BP Petroleum de-branded 54 of Bulk's stations and 32 dealer locations.   Bulk responded with a lawsuit in December 2007.   The parties settled, the Bankruptcy Court has approved the settlement in September 2009, and the parties are in the process of closing it.

From 2008 until 2009, the price of fuel increased to historic high levels.   Coupled with that increase was a real estate crisis that caused lenders to tighten credit for mortgages.   As a result, Bulk could not sell stations for a profit.   The increased fuel prices reduced Bulk's fuel sales.   These events adversely affected Bulk's business in the following ways, all of which contributed to Bulk seeking protection under chapter 11.

- Fuel prices rose from $2 to $4 per gallon during a 12 month period in 2008.

- The increased prices resulted in sales of fuel decreasing by 20 to 30%.

- Bulk's cost for credit card fees doubled because they are a percentage of the fuel sales.   While the cost increased, Bulk's gross profit margin did not and its sales declined.

- In 2007, 75% of gas sales were purchased with cash and 25% were purchased with credit cards.   After 2007 the percentages reversed: 75% of gas sales were with credit cards and 25% with cash.   This significantly increased Bulk's costs,

5

compounding the problem from the fuel price increase.

- Bulk's business model was supplying fuel to operators on consignment at the stations it owned and leased to operators. Although Bulk's agreements with operators allowed Bulk to set the prices, during the rapid rise in prices, many operators lowered prices in order to meet competition. Sometimes, operators sold Bulk's fuel at a loss.

- Bulk's loss of BP and CITGO branding on over 100 locations caused a significant decrease in fuel sales.

- As the economy worsened, Bulk's accounts receivable increased by $2 million from 2007 to 2008 that Bulk believes is uncollectable.

- The tight credit market prevented Bulk from selling stations. Sales of real property historically contributed significantly to Bulk's profitability. In 2007, Bulk recorded $14 million in profits from the sale of properties.

Bulk reached out to its lenders toward the end of 2008 and early 2009 seeking a reduction of its monthly payments so that it could weather the financial problems it faced. Its lenders faced their own financial problems and were generally unresponsive to Bulk's requests. When it realized that its lenders would not be able to work with Bulk, Bulk decided that a chapter 11 filing was the only alternative to restructure its finances. On February 17, AnchorBank served a foreclosure action. Bulk and its related companies filed for protection on February 18, 2009.

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 PROCEEDINGS

Bulk retained its chapter 11 counsel approximately one week before its filing. Other than the minimum pleadings required for a chapter 11 case, there was no time for preparation. Bulk

6

obtained the use of cash collateral on a preliminary basis and has continued to use cash collateral on that basis until the present time.

Bulk took four months to complete its schedules, a large undertaking for 28 separate, inter-related companies.

Within a month of the chapter 11 filing, Bulk outlined its approach to reorganizing its business.   Generally, it sought to sell closed, unprofitable stations and to negotiate new leases with operators.   Many of the leases had one-time payments at the commencement of the lease with Bulk receiving ongoing income from the fuel sales.   Bulk believed that most of the operators would have agreed to re-negotiated leases in exchange for greater certainty that they could retain operations of their stations.   Bulk also sought to reduce the monthly payments to its lenders either from a decrease in the principal amount of the loans by approximately 15% or a reduction in the interest rate.   Without the restructuring of its leases, Bulk anticipated its financial condition would deteriorate.

In March the committee of unsecured creditors appointed by the U.S. Trustee (the "Committee") retained Pepper Hamilton of Philadelphia and Howard Solochek & Weber of Milwaukee.   Certain lenders and the Committee believed that a sale of Bulk's properties was the quickest way to pay off creditors.

Bulk cooperated and stood aside while the Committee and lenders (with Amcore Bank, Bulk's largest lender, taking a lead role) negotiated an agreement for selling stations.   During the process, in late April, Bulk participated in interviewing real estate consultants that could serve as brokers in a sales process.   The lenders and Committee agreed on Hilco to provide the services. Bulk consented.   The lenders and Committee presented Bulk with their agreement for a sale and

7

the terms of Hilco's retention in late June 2009.

After some further discussion, Bulk filed pleadings to approve Bulk's retention of Hilco and the agreement.   The agreement provided for a "carve-out" from the lenders' collateral that would benefit Bulk's chapter 11 estate.   In general, the carve-out consists of 5% of the gross proceeds from the sales of lenders' properties and all of the lenders' collateral that is not real property, which includes the gasoline stations.   It also set forth a distribution scheme for all of Bulk's assets.

Four lenders consented to the "Carve-Out Stipulation."   Fourteen did not.   Various parties objected to the Bankruptcy Court's approval of it.   Changes were made and eventually, the Court approved the stipulation in August.   The sales process contemplated by the Carve-Out Stipulation, or "Hilco Sales Process," is proceeding and the Plan incorporates it into the Plan, as well as the distribution scheme in the stipulation to the extent it is consistent with the requirements of the Bankruptcy Code.

Shortly before the chapter 11 filings, Bulk settled the lawsuit with BP Petroleum.   It sought approval of the settlement in April.   The Committee requested additional time to review the settlement.   Additionally, there were complications with the properties affected by it.   The Court approved it in September.   As a result of the settlement, BP Petroleum's claim (filed in an amount of $25+ million) is satisfied and Bulk receives assignment of BP Petroleum's liens on properties owned by Bulk's related companies.

Beginning in approximately April, Bulk and the Committee determined that Bulk could not make "adequate protection" payments to Bulk's lenders.   Many of those lenders filed motions to obtain relief from the automatic stay and foreclose on their liens in state court proceedings.

8

None of the lenders that agreed to the Carve-Out Stipulation, the "Participating Lenders," filed motions for relief from the automatic stay.

Bulk was hampered in responding to the motions because it did not have current appraisals on the properties. It had appraisals for most properties. As a part of Hilco's retention, it performed "desk-top" valuations. Those valuations were not MAI certified appraisals but provided a knowledgeable third's parties' view of the values to assist the Committee and Bulk in making decisions on responding to the motions for relief from the automatic stay. Hilco provided those in late September and early October. The result is that Bulk has reached stipulations to resolve most of the motions and expects to resolve the remaining motions by stipulation.

During the case, there were a number of lawsuits, or adversary proceedings, involving Bulk. They included a case against certain insurers seeking payment of costs for environmental remediation of stations, a suit against the State of Kentucky for a refund for the double payment of sales taxes, and a suit against Grewal et al. to evict operators and collect more than $1.5 million that Bulk claims is due it.

Bulk also obtained a limited injunction against certain creditors to prevent them from proceeding against Dhaliwal so that he could focus on the Hilco Sales Process, and negotiating and proposing the Plan. Bulk filed the Plan and this Disclosure Statement within its exclusive period to file a plan.

## CONFIRMATION HEARING

The Bankruptcy Court has scheduled a hearing to consider the confirmation of the Plan at **January __, 2010 at __:__ _.m.** (the "Hearing Date"). The Bankruptcy Court has directed that

9

objections, if any, to confirmation of the Plan be served and filed on or before **January __, 2010.** The hearing set to occur on the Hearing Date may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment made at the hearing or any subsequent adjourned hearing.

## OVERVIEW OF THE PLAN

Highlights of the Plan are set out below. This overview is intended solely provide a general understanding of the Plan. It omits a detailed description of the Plan in order to provide a more easily described overview. The Plan should be read in its entirety. **Any conflict between this Disclosure Statement and the Plan will be resolved in favor of the Plan**.

### *Description of Sources to Pay Claims*

There are three parts to the Plan. They are (1) the sale of the Participating Lenders' real estate collateral that pays their Secured Claims and carves-out 5% of the sales price for the benefit of Debtors' estates; (2) the sale of unencumbered assets of the Debtors in order to pay Creditors; and (3) the sale of certain assets to "New Bulk" in exchange for it assuming certain liabilities, including the $4.8 million Claim owed to the State of Indiana, paying $650,000 to the Reorganized Debtor, and continuing to manage properties that constitute the Participating Lenders' collateral until they can be sold in the Hilco Sales Process.

### *(1)     Sale of Participating Lenders' Collateral and "Carve-Out Fund"*

The Participating Lenders collectively have liens on 64 stations that are presently operating. Hilco valued those at between $22.4 and $24.8 million. The Reorganized Debtor anticipates receiving a 5% Carve-Out of $1.1 million from those properties as they are sold (5% of $22.4 million).

10

In addition, the Participating Lenders also have liens on 37 closed stations that Hilco valued at a high of $8.7 million. The 5% Carve-Out of that amount is $436,750.

Until the properties are sold, "New Bulk" will manage the properties, and supply them with fuel. For these services, New Bulk will receive the profits from the fuel sales and receive 50% of the amounts that it collects from the leases in place. The other 50% will be retained by the Reorganized Debtor to pay ongoing costs such as insurance and environmental compliance costs.

In addition to the 5% Carve-Out, the Participating Lenders (principally, Amcore Bank) have liens on accounts receivable, personal property and other property of the Debtors. The Debtors filed an application to retain Howard Solochek & Weber as special counsel to collect most of the receivables on a contingency fee that ranges between 20 and 25% plus costs. Upon the Effective Date, the Committee will be vested with control of collecting those receivables. The gross amount of those receivables is $15.7 million. The Debtors estimated that 85% of 2009 invoices, 65% of 2008 invoices, 40% of 2007 invoices, 25% of 2006 invoices and 0% of older invoices are collectible. Based upon these estimates, the gross amount collected would be $7.9 million of which an estimated 25%, or $2 million, would be paid for costs of collection, leaving a net of $5.9 million.

There is also a refund the Debtors claim is due from the State of Kentucky of approximately $600,000 net of any amount due the State. This is subject to an adversary proceeding and appears ripe for a summary judgment determination within approximately 90 days. There is also the payment of $650,000 from New Bulk for the assets it purchases. There may be other assets but they are not material to the Plan.

11

In summary, the Debtors anticipate (but *do not* represent or guaranty) a net amount of $8.7 million available from the carve-out of the Participating Lenders' collateral to be the "Carve-Out Fund," established pursuant to 5.7 of the Plan distributed to Creditors later in this Disclosure Statement.

        *(2)*        *Sale of Unencumbered Assets and the "Unencumbered Asset Fund"*

The Debtors will sell the unencumbered assets listed on Addendum 5.5 to the Plan pursuant to the Hilco Sales Process. Based upon Hilco's valuations, the Debtors expect to receive a total of $4.7 million, pay 5% for Hilco's services of $235,600, pay real property taxes of $67,900 and net approximately $4.4 million. In addition, the Debtors will have approximately $242,000 on the Effective Date from the sales of unencumbered property available in their attorney's trust accounts. The Committee will also investigate voidable transfers pursuant to chapter 5 of the Code and other receivables such as the one from Dhaliwal. Any recovery shall be included in the Unencumbered Asset Fund. Since the amount is unknown, no value for those is given. The total of all these amounts is estimated to be $4.6 million and will be included "Unencumbered Asset Fund" established pursuant to 5.8 of the Plan and distributed to Creditors as described later in this Disclosure Statement.

        *(3)*        *Asset Sale to "New Bulk"*

Before the Effective Date, Dhaliwal, Daniel Huffaker and John Gerth will form New Bulk. Dhaliwal shall own 49% of New Bulk with the balance being equally owned by Huffaker and Gerth.

The Reorganized Debtor will sell the assets listed on Addendum 5.6 to the Plan, subject to existing encumbrances, to New Bulk. Based upon Hilco's highest values for real property, the

12

net value of the real estate being transferred to New Bulk is $754,400. In addition, inventory, accounts and accounts receivable less than 60 days are also being sold to New Bulk with the assignment of unexpired leases listed on Addendum 5.6. The estimated total value of the property being sold to New Bulk, net of liens, is $2.9 million. However, when Marathon is paid as provided in the Plan, its liens will be satisfied and the value of the property sold to New Bulk would be $4.9 million.

In consideration of the sale, New Bulk will assume the entire obligation owed the State of Indiana for excise taxes that are entitled to Priority or Secured status. They are estimated to total $4,851,500. In addition, New Bulk will pay the real estate taxes associated with the properties transferred to it estimated at $157,000 and pay the Carve-Out Fund $650,000 within 120 days of the transfer. This is a total of $5,628,500 in exchange of assets with a value when they are transferred to New Bulk of $2,885,072. (Upon Marathon being paid as provided in the Plan, its liens will be satisfied and the value of the assets transferred to New Bulk would be $4,881,846.)

In addition, New Bulk will manage the Reorganized Debtor for a fee equal to 50% of the amounts that it collects from operators of properties to be sold through the Hilco Sales Process plus retain the profits from the sales of gasoline to those stations until they are sold.

### *Distributions from Unencumbered Asset Fund*

The proceeds of the unencumbered assets as described earlier will be paid into the Unencumbered Asset Fund. From that fund, the proceeds will be distributed as follows under the terms of the Plan:

[See next page.]

13

| Description | Assumed Amount |
|---|---|
| Total Assumed Funds from Sales of Assets | $ 4,675,000 |
| Recoveries from Avoidance Actions and Officer Loans | $ Unknown |
| Payment of Lease Assumptions | $ ( 120,200) |
| Payment of Wages | $ ( 5,500) |
| Paid to Classes 1B, 1C and 1D | $ (4,549,300) |
| (§ 503(b)(9) and Environmental Claims Entitled to Administrative Expense Status Estimated to be $5,303,400 in total; this includes $500,000 paid to Marathon from the sale of one property) | |
| Paid to Carve-Out to Reimburse it for Professional Fees and Expenses Paid | $ ( 0 ) |
| Paid to General Unsecured Creditors (3.7 of Plan) | $ ( 0 ) |

In addition, the Reorganized Debtor will receive 50% of receipts from operators. Those funds will pay operational expenses. Any excess will be included in the Unencumbered Asset fund. The Reorganized Debtor will also receive proceeds from any avoidance actions.

***Distributions from Carve-Out Fund***

The proceeds of the assets carved-out of Participating Lenders' collateral, as described earlier, will be paid into the Carve-Out Fund. From that fund, the proceeds will be distributed as follows under the terms of the Plan:

[See next page.]

14

| Description | Assumed Amount |
|---|---|
| Total Assumed Funds from Sales of Assets | $ 8,772,000 |
| Payment of Professional Fees and Expenses (Amount is estimated) | $ ( 500,000) |
| Carve-Out for General Unsecured Creditors | $ ( 2,000,000) |
| Balance for 60/40 Split | $ 6,272,000 |
| 60% Payment to Participating Lenders | $ (3,763,200) |
| 40% Balance for Distribution to Other Creditors | $ 2,508,800 |
| Paid Pro Rata to Classes 1B, 1C and 3B | $ (1,418,000) |
| (§ 503(b)(9) and Environmental Claims Entitled to Administrative Expense Status Estimated to be $5,303,400 in total) | |
| Paid to All Unsecured Creditors (3.7 of Plan) | $ (1,090,800) |
| Total Amount Paid to Unsecured Creditors: (plus avoidance action recoveries) | $ 3,090,800 |

## CHAPTER 7 LIQUIDATION

If the Plan is not confirmed, the Debtors' cases could be converted to chapter 7 which

would result in a trustee being put in place and the Debtors ceasing their business operations. A

liquidation analysis is attached to this Disclosure Statement as Addendum 1 to demonstrate the

Debtors' estimated distribution of assets if the case were converted to chapter 7. The values of

all real property are based upon valuations provided by Hilco. Addendum 1 shows that the

Participating Lenders would receive $962,910 in total instead of the $3.8 million projected under

15

the Plan and Unsecured Creditors would receive $2 million instead of the $3.1 million projected under the Plan. In both a chapter 7 proceeding and under the Plan, the estimated amounts to be paid to Unsecured Creditors do not include recoveries of avoidance actions. However, that amount would be the same so under the Plan Unsecured Creditors realize $1.1 million more than they otherwise would realize under chapter 7.

The reason for the greater benefit to Unsecured Creditors and the Participating Lenders under the Plan is due to New Bulk assuming responsibility for the Priority and Secured taxes owed the State of Indiana of approximately $4.9 million. Additionally, the Debtors are able to assume the executory contracts with Marathon and assign them to New Bulk. This avoids Marathon possibly having a Secured Claim equal to the amount of its collateral (which is valued at $2.5 million) plus a priority claim of $5.4 million pursuant to § 503(b)(9). New Bulk will also continue to operate the Debtors' businesses while properties are sold. The Debtors believe this continuity will assist in collecting receivables and avoid unforeseen problems that may be caused by a disruption of the Debtors' businesses.

## AVOIDANCE ACTIONS AND CLAIMS AGAINST INSIDERS

Within the four years of the Debtors' filing their chapter 11 petitions, the Debtors sold approximately 24 properties to JT Petroleum and other entities considered Insiders. JT Petroleum is owned by Dhaliwal's son. All the properties were subject to mortgages. Generally, the consideration was the assumption of the underlying debt associated with the property. The December 31, 2007 audited financial statements showed net income of $1.2 million after depreciation and amortization expenses of $6.6 million and a nonrecurring charge of $2.2 million. The auditor did not issue a qualified going concern opinion.

16

The Debtors' financial records show a receivable from Dhaliwal of approximately $5 million. During the four years before the chapter 11 filings, Dhaliwal received an annual salary of approximately $170,000. Trusts established more than ten years ago for the benefit of Dhaliwals' children lent more than $__ million within the four years before the chapter 11 filings that remained unpaid when the cases were filed.

The Debtors offer no opinion as to the likely recovery from these actions. Pursuant to the Plan, the right to bring actions to recover funds from Dhaliwal, JT Petroleum or any Insider is vested in the Committee. Its fees for investigating and bringing actions are paid before general Unsecured Creditors.

## DESCRIPTION OF PLAN CLASSES AND THEIR TREATMENT

*Class 1A: Administrative Expenses.* These consist of Administrative Expenses. They include professional fees and amounts necessary to cure defaults for assumed leases. The Debtors are generally current with payment of professional fees. They anticipate fees of $100,000 being unpaid and due on the Effective Date. They anticipate amounts necessary to cure defaults being $120,000 on the Effective Date. The Administrative Expenses will be paid from the cash on hand or the amounts held in trust from the sales of unencumbered property or a carve-out of a lenders' proceeds from the sale of its collateral.

*Class 1B: Section 503(b)(9) and Secured Claims of Marathon.* Marathon's Priority and Secured Claims total approximately $ 6.9 million. They shall be paid he Allowed Claims in Class 1B consist of Marathon's Allowed Secured and Priority Claims. They shall be paid $1.5 million from a letter of credit drawn on Cross Plains that Marathon has already received, with the balance paid from the sale of store no. P107 for approximately $500,000, the Unencumbered Asset Fund

17

and the Carve-Out Fund.   Marathon's Claims will be paid as soon as the proceeds from assets are available, after reserving sufficient funds for anticipated professional fees.   Marathon shall retain its liens on three other properties sold to New Bulk until Marathon is fully paid at which time it shall release its liens.   The Debtors are assuming the contracts with Marathon and assigning them to New Bulk.   Marathon filed a contingent claim for $14.4 million in damages if its contracts are rejected.   Assigning them to New Bulk will eliminate that Claim.

   *Class 1C: Section 503(b)(9) Claims Excluding Marathon.*   The other Priority Claims under § 503(b)(9) total approximately $426,000 and will be paid in the same manner as Marathon and share equally from distributions from the Unencumbered Asset and Carve-Out Funds.

   *Class 1D: Environmental Administrative Expense.*   Environmental Expenses were paid in the ordinary course of business by the Debtors in Possession and after the Effective Date will be paid by the Reorganized Debtor.   Any Allowed Environmental Expense that was not paid in the ordinary course of business by the Debtors in Possession or by the Reorganized Debtor shall be paid from the proceeds of the sale of, or assumed by the purchaser of, any property for which the expense is related.

   *Class 2: Priority Wage Claims.*   Wages were paid during the pendency of the cases, although proofs of claim were filed for unpaid vacation pay of $5,417 by employees whose employment terminated shortly after the cases were filed.   They will be paid from the cash on hand on the Effective Date.

   *Class 3A: Priority Tax Claims Owed The State of Indiana.*   New Bulk will assume and pay the Priority Tax Claims owed Indiana of approximately $4.9 million in monthly installments with interest of approximately $23,164.   Additionally, New Bulk will grant liens on four

18

properties the Debtors are selling to New Bulk to secure payment of the Claim. The liens for Indiana are subject to existing liens of Marathon on three of the properties.

*Class 3B: Priority Unsecured Tax Claims Owed Other Taxing Authorities.* Other Priority Taxes of approximately $638,000 will be paid with interest from the Unencumbered Asset and the Carve-Out Funds as assets are liquidated.

*Class 4A: Property Tax Claims for Properties Sold to New Bulk.* New Bulk will pay the real and personal property tax claims secured by the properties sold to it of approximately $157,000 in monthly installments of approximately $4,429 with interest over 5 years from the Petition Date.

*Class 4B: Property Tax Claims for Properties Sold Pursuant to the Hilco Sales Procedure.* Secured tax Claims relating to properties sold pursuant to the Hilco Sales Procedure will be paid in full with interest from the proceeds of the sale.

*Class 4C: Property Tax Claims for Properties for Which the Automatic Stay Was Terminated.* Secured tax Claims relating to properties for which the automatic stay was lifted are unimpaired and retain all of their rights.

*Class 5A: Secured Claims of Participating Lenders.* The Secured Claims of Participating Lenders will be satisfied from the sale of their collateral pursuant to the Hilco Sales Process. Unsecured deficiency Claims will be treated as Class 7 Unsecured Claims.

*Class 5B: Capmark's Secured Claim.* Capmark's Secured claim of approximately $240,000 shall be paid in full within 10 days of the Effective Date. The funds to pay Capmark shall be paid from Cross Plains upon the Debtor transferring store no. 1135 to Cross Plains.

*Class 5C: Cross Plains' Secured and Alleged Priority Claims.* Cross Plains' Claim is

19

approximately $3.6 million.   It asserts priority status pursuant to § 503(b)(9) for $1.4 million as the subrogee of Marathon and Valero.   They drew on letters of credit issued by Cross Plains to pay debts owed by the Debtors for product delivered within 20 days of the Petition Date.   Cross Plains also asserts a Secured Claim of approximately $1.1 million in the Debtors' bank account at Cross Plains on the Petition Date pursuant to a deposit agreement with the Debtors.   In full satisfaction of Cross Plains' Claims, the Reorganized Debtor will transfer two properties encumbered by liens of third parties, two properties subject to the existing mortgage liens of Cross Plains, and six unencumbered properties to Cross Plains.   According to the Hilco's valuations and the Debtors' valuation of one property (a liquor store), the total value of the equity in the properties to be transferred to Cross Plains is approximately $1.8 million.

*Class 5D: Layton State Bank's Secured Claim.*   Layton State Bank's Secured Claim of approximately $1.6 million will be paid by New Bulk in equal monthly installments of principal with interest at the rate of 4% per annum amortized over 25 years with the entire amount due on the 84th month after the Effective Date.   The two properties that collateralize the bank's Claim are being sold to New Bulk subject to the liens.

*Class 5E: National City Bank's Secured Claim.*   National City Bank's Secured Claim of approximately $2.6 million that relate to the collateral for which the automatic stay has not been terminated will be paid by New Bulk in monthly installments with interest at the rate of 4% per annum amortized over 25 years with the entire amount due on the 84th month after the Effective Date.   The Debtors will transfer the five properties that are the bank's collateral to New Bulk subject to the bank's liens.

*Class 5F: American Founders Bank's Secured Claim.*   American Founders Bank's

20

Secured Claim of $435,820 that relates to the collateral for which the automatic stay has not been terminated will be paid by New Bulk in monthly installments with interest at the rate of 4% per annum amortized over 25 years with the entire amount due on the 84th month after the Effective Date. The Debtors will transfer the property that is the bank's collateral to New Bulk subject to the bank's liens. In addition, if the Debtors or New Bulk obtains a purchaser for Store No. 6303 at 1680 Versailles Rd., Frankfort, KY at gross purchase price of at least $700,000 before the bank completes its foreclosure sale on that property, the bank will discharge any deficiency claim it may have from that property.

*Class 5G: U.S. Bank's Secured Claim.* U.S. Bank's Claim of approximately $565,000 that is secured by the property located at 9653 N. Granville Rd., Mequon, WI (store no. B1) will be paid in full within 10 days after the Effective Date by Cross Plains upon the Debtors' transferring the property to it.

3.5H *Class 5H: Secured Creditors with Real Property Collateral For Which the Automatic Stay Was Terminated.* These Secured Claims are satisfied by their exercising their state legal rights against their collateral pursuant to the order granting them relief from the automatic stay.

*Class 6A: Secured Creditors Not Otherwise Classified That Obtained Relief From the Automatic Stay.* Secured Claims of lenders whose collateral was not real estate and which obtained relief from the automatic stay are satisfied by their exercising their state legal rights against their collateral pursuant to the order granting them relief from the automatic stay.

*Class 6B: Secured Claims Assumed by New Bulk.* New Bulk shall assume the obligations for the Secured Claims listed on Addendum 3.6B.

*Class 7: Allowed Unsecured Claims.*   Unsecured Claims will receive a Pro Rata share from the Unencumbered Asset Fund pursuant to 5.8(d) of the Plan unless they affirmatively vote to receive the alternative treatment described in 3.7(b) of the Plan.   The amount paid to creditors that do not elect the alternative treatment will depend on the recoveries from avoidance actions. If no amounts are recovered, the Debtors estimate that nothing will be paid to them.

Alternatively, Unsecure Creditors can elect the alternative treatment.   Under that treatment, they share in funds available from the Carve-Out Fund distributed in the following order:

(1)   $2 million shared on a Pro Rata by general Unsecured Claims.   This excludes Claims of the Participating Lenders and unsecured deficiency Claims of other Secured Creditors.

(2)   Sixty percent (60%) of the balance paid to Participating Lenders which shall determine the allocation of payment (payment estimated to be $3.8 million).

(3)   Forty percent (40%) of the remaining balance shall be paid to:

(i)   Unpaid priority tax and § 503(b)(9) Claims in Classes 1C, 1D and 3B (payment estimated to be $1.4 million); and

(ii)   Unsecured Claims that elected the alternative treatment, excluding Claims of the Participating Lenders (payment estimated to be $1.1 million).   The estimated total amount paid to Unsecured Creditors would be $3.1 million.

The Creditors electing the alternative treatment agree that any Claim they may have against Dhaliwal, his spouse and any Insider is fully satisfied by the Debtors' vesting Claims against these persons with the Committee and that any amount that may be owed by Dhaliwal or his spouse will not be satisfied from his interest in New Bulk.

The Participating Lenders are deemed to have affirmatively voted to receive the alternative treatment.

*Class 8: Equity Interests in the Debtors.*   The interests in Class 8 are unimpaired.


## NEW BULK'S ABILITY TO FULFILL ITS OBLIGATIONS UNDER THE PLAN

A financial pro forma for New Bulk is attached as Addendum 1.   It demonstrates that New Bulk has the ability to meet its monthly obligations to Classes 3A and 4A, and the $650,000 payment to the Carve-Out Fund.


## VOTING AND CONFIRMATION

**Voting.**   After carefully reviewing this Disclosure Statement and the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.   Your Claims may be classified in more than one Class and, in such case, you should vote accordingly.   Please arrange to return the ballot so that it is received no later than the date stated on the ballot, **January __, 2010.**   Please note that all ballots with respect to the Plan must be received no later than **January __, 2010.**   In order for the Plan to be accepted, two thirds of the dollar amount of the vote in each Class and a majority of Creditors casting ballots in each class must approve the Plan.

If you do not vote to accept the Plan, or if you are the holder of an impaired Claim, you may be bound by the Plan if it is accepted by the requisite holders of the Claims.

If you have any questions about the procedure for voting, or if you did not receive a ballot, received a damaged ballot or lost your ballot, please call Jerome R. Kerkman, attorney for

23

the Debtor at 414.277.8200, or email him at jkerkman@kerkmandunn.com.

**Hearing on Confirmation.**   At the hearing on the confirmation of the Plan, the Court will determine, among other things, whether the Plan has been accepted by each impaired Class of Creditors.

An impaired Class is deemed to have accepted the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims or interests of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.   Unless there is unanimous acceptance of the Plan by the members of an impaired Class of Claims, the Court must also determine that under the Plan the members of such Class will receive property of a value as of the Effective Date which is not less than the amount that the members of such Class would receive or retain if the Debtor was liquidated under Chapter 7 of the Code.

**Confirmation of Plan Without Necessary Acceptances.**   The Plan may be confirmed even if it is not accepted by one or more classes if (a) the Plan is accepted by at least one impaired Class of Claims, and (b) the Court finds that the Plan does not discriminate unfairly against, and is fair and equitable as to each impaired Class which has not accepted the Plan.   With respect to Secured Claims, "fair and equitable" means the Secured Creditors must (a) receive deferred cash with payments equal in value to the value of their Claims and retain the lien securing their Claims, (b) receive a lien on the proceeds of the sale of the property securing their liens, or (c) receive the indubitable equivalent of their Claims.

**THE DEBTOR MAY SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE CLASSES DO NOT VOTE TO ACCEPT THE PLAN.**

24

## DISPUTED CLAIMS

If any objection or opposition is made to the allowance of the Claim or interest of any Creditor hereunder and such objection or opposition is pending on the date that payments or distributions are to be made under the Plan, then no payment or distribution shall be made to such Creditor until an order of the Bankruptcy Court determining the validity and amount of such Claim or interest is entered and no longer subject to further review or appeal, at which time such payment and distribution of the amount awarded such Creditor shall be made. Unless the Court orders otherwise, objections to claims are due 120 days after the Effective Date.

## EFFECT OF CONFIRMATION

The provisions of the Plan shall be binding upon the Debtor and any Creditor or equity security holder, whether or not such Creditor or equity security holder has accepted the Plan and regardless of whether the claims of such Creditor or equity security are impaired under the Plan. Upon confirmation of the Plan, all property will vest in the Reorganized Debtor. Except as otherwise provided in the Plan, all property dealt with by the Plan shall be free and clear of all Claims and interests of Creditors and equity security holders.

## CONCLUSION

The Debtor proposes its Plan because it is in the best interests of all interested parties. It maximizes the value paid to Creditors, preserves the Hilco Sales Process requested by the

Committee and Participating Lenders and allows the going concern value of the Debtor's business to benefit Creditors. For these reasons, the Debtor requests that Creditors vote in favor of the Plan.

Dated: November 6, 2009.

/s/ Jerome R. Kerkman
Jerome R. Kerkman
Kerkman & Dunn

General Counsel for Bulk Petroleum Corporation
and Special Counsel to the other Debtors

P.O. Address:

757 North Broadway, Suite 300
Milwaukee, WI 53202-3612
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: jkerkman@kerkmandunn.com

**Addendum 1**
**Liquidation Analysis**

| Descriptions | Total Estimated Liquidation Proceeds | Payment of Cross Plains Lien on Account | Assets Subject to Carve-Out | Assets Subject to Liens of Marathon | Debtor's Unencumbered Assets |
|---|---|---|---|---|---|
| **Sources of Cash** | | | | | |
| Proceeds from Accounts Receivable | $7,951,988 | | $7,951,988 | | |
| Attorney Fees to Collect Accounts Receivable | -$1,987,997 | | -$1,987,997 | | |
| Kentucky Tax Refund | $600,000 | | $600,000 | | |
| Proceeds from Unencumbered Properties sold per Hilco Sales Process | $4,432,779 | | | | $4,432,779 |
| Proceeds from P107 and Subject to Marathon Lien sold per Hilco Sales Process | $500,000 | | | $500,000 | |
| Cash in Trust or that Debtors Anticipate Being Received Before the Effective Date from Unencumbered Property | $241,904 | | | | $241,904 |
| 5% Carve-Out Fee Paid from Participating Lenders' Collateral sold per Hilco Sales Process | $1,558,000 | | | | |
| Proceeds from Sales of Properties Subject to Marathon Liens if sold per Hilco Sales Process | $1,996,774 | | | $1,996,774 | |
| Working Capital as of Effective Date (reduced by Cross Plains' Lien from its Deposit Agreement | $2,136,340 | $1,100,000 | $1,036,340 | | |
| Proceeds of Sale of No. 6355 that is Subject to Lien of American Founders Bank if sold per Hilco Sales Process | $5,680 | | | | $5,680 |
| Proceeds from Sales of Properties Formerly Subject to BP Petroleum's Liens if sold per Hilco Sales Process | $2,248,732 | | | | $2,248,732 |
| Proceeds from the Sales of Unencumbered Property Paid to Cross Plains to Satisfy Its Lien sold per Hilco Sales Process | $1,315,000 | | | | $1,315,000 |
| **Gross Total** | $20,999,200 | | $7,600,331 | $2,496,774 | $8,244,095 |
| | | | | | |
| **Distribution of Cash** | | | | | |
| Paid to Marathon on its Breach of Contract Damages (asserted as secured by its mortgage liens) | | | | $2,496,774 | |
| Hilco Fees for Sales (5% of the Properties Formerly Subject to BP Petroleum's Liens and to be paid to Cross Plains) | | | | | $178,187 |
| Chapter 7 Trustee Fees | | | | | $267,323 |
| Lease Assumption Costs | | | | | $120,144 |
| Marathon's 503(b)(9) Priority Claim (net of the payment by Cross Plains) | | | | | $5,377,430 |
| Other 503(b)(9) Priority Claims | | | | | $425,967 |
| Cross Plains' Asserted 503(b)(9) Priority Claim as Marathon's Subrogee | | | | | $1,400,000 |
| Professional Fees | | | | | $500,000 |
| Priority Wage Claims | | | | | $5,417 |
| Tax Claims (Indiana and others) | | | | | $5,490,064 |
| Shortfall for Payments to Priority Creditors | | | | | -$5,520,436 |
| | | | | | |
| Carve Out for Professional Fees and Priority Claims (excluding 503(b)(9)) | | | $5,995,481 | | |
| Estimated Professional Fees | | | $500,000 | | |
| $2 million Carve-Out for Unsecured Creditors | | | **$2,000,000** | | |
| Paid to Priority Claims | | | $3,495,481 | | |
| | | | | | |
| Balance for 60/40 Split ($7,600,331 minus $5,995,481) | | | $1,604,850 | | |
| 60% to Participating Lenders | | | **$962,910** | | |
| 40% to the Debtors | | | $641,940 | | |
| | | | | | |
| Debtors' 40% paid pursuant to chapter 7 priority scheme: | | | | | |
| Unpaid Priority Claims | | | -$641,940 | | |
| Balance to Unsecured Creditors | | | $0 | | |
| | | | | | |
| **Total Amount Paid to Participating Lenders:** | | | **$962,910** | | |
| **Total Amount Paid to Unsecured Creditors plus Recoveries from Avoidance Actions and Officer Receivables:** | | | **$2,000,000** | | |

**Addendum 1 (cont.)**
**Liquidation Analysis**

In preparing the liquidate analysis, the Debtors made the following assumptions:

      1.      The highest values assigned determined by Hilco for the real property would be realized.

      2.      The distribution of the proceeds that were subject to the Carve-Out Stipulation would be distributed pursuant to the terms of the Stipulation even though the Participating Lenders may not be bound to follow it.

      3.      The same assumptions used to value the property transferred to New Bulk would apply to the liquidation of the collateral, including valuing accounts receivable to be transferred to New Bulk, inventory and accounts at 100% of their book values.

28

**Addendum 2**

**New Bulk Financial Pro Forma**

[To be supplied]

29